Matter of Aleksanian (Corporate Transp. Group, Ltd.--Commissioner of Labor) (2020 NY Slip Op 01428)





Matter of Aleksanian (Corporate Transp. Group, Ltd.--Commissioner of Labor)


2020 NY Slip Op 01428


Decided on February 27, 2020


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: February 27, 2020

529032

[*1]In the Matter of the Claim of Levon Aleksanian, Respondent. Corporate Transportation Group, Ltd., Appellant. Commissioner of Labor, Respondent.

Calendar Date: January 17, 2020

Before: Garry, P.J., Egan Jr., Clark, Mulvey and Colangelo, JJ.


Naness, Chaiet & Naness, LLC, Jericho (Clifford P. Chaiet of counsel), for appellant.
Brooklyn Legal Services, New York City (Nicole Salk of counsel), for Levon Aleksanian, respondent.
Letitia James, Attorney General, New York City (Mary Hughes of counsel), for Commissioner of Labor, respondent.



Mulvey, J.
Appeals from two decisions of the Unemployment Insurance Appeal Board, filed October 12, 2018, which ruled that Corporate Transportation Group, Ltd. was liable for unemployment insurance contributions on remuneration paid to claimant and others similarly situated.
Corporate Transportation Group, Ltd. (hereinafter CTG) provides black car limousine services to corporate clients in and around New York City. CTG manages several franchise companies, including Allstate Private Car & Limousine, Inc. Claimant worked as a driver pursuant to a franchise agreement with Allstate from March 2011 to August 2014. Following claimant's application for unemployment insurance benefits, the Department of Labor issued a determination that CTG exercised or reserved the right to exercise sufficient supervision, direction and control over claimant's services as to establish an employer-employee relationship and, as a result, CTG had to pay unemployment insurance contributions on the earnings of claimant and all other persons similarly situated. CTG objected to the determination, and, following a hearing, an Administrative Law Judge sustained the Department's determination and overruled CTG's objections. Upon administrative review, the Unemployment Insurance Appeal Board adopted the findings of the Administrative Law Judge and affirmed. CTG appeals.
We affirm. "Whether an employer-employee relationship exists is a factual determination for the Board, and its decision will be upheld if supported by substantial evidence" (Matter of Millennium Med. Care, P.C. [Commissioner of Labor], 175 AD3d 755, 756 [2019] [internal quotation marks and citations omitted]; see Matter of Hennessy [Hearst Corp.-Commissioner of Labor], 172 AD3d 1842, 1843 [2019], appeal dismissed 34 NY3d 943 [2019]). "[A] determination that an employer-employee relationship exists may rest upon evidence that the employer exercises either control over the results produced or over the means used to achieve the results, and . . . control over the means is the more important factor to be considered" (Matter of Loewecke [LaRue-Commissioner of Labor], 172 AD3d 1860, 1861 [2019] [internal quotation marks and citations omitted]; see Matter of Magdylan [Munschauer-Commissioner of Labor], 172 AD3d 1832, 1833 [2019]).
The record reflects that CTG recruited drivers through word of mouth and advertising on the radio and Internet. Claimant began working as a driver for CTG after being referred by his father, who also worked for it. CTG required drivers to be licensed by the New York City Taxi & Limousine Commission and to purchase a suitable vehicle, so claimant obtained the necessary license and vehicle. CTG provided claimant with a phone to access the mobile application with CTG's dispatch system, which cost $56 per week, along with a manual on how to use the application and work training. Additionally, claimant was given a window sign and a magnet with Allstate's name that he was required to display, a printer for printing credit card receipts for customers, and a rule book. According to the rule book, drivers were required to dress in business attire and could be fined if they violated the dress code. CTG also conducted initial and subsequent vehicle inspections and could fine the drivers for having an improperly maintained or dirty vehicle. Moreover, drivers were subject to random drug testing by CTG.
CTG set the fares for claimant's services; claimant received 70% of the fares and CTG retained the 30% balance as its fee. The majority of claimant's rides were preassigned. The Board credited claimant's testimony that he had to notify CTG's dispatcher what 12-hour shift he wanted to work. Claimant was then given his rides, generally a day before, and accessed on his mobile application all relevant information about each ride, including the customer information, the pick-up and drop-off locations, the price and the job confirmation number. If claimant received an assignment, he was expected to complete it. Claimant had to inform the CTG dispatcher if he was sick and provide at least a day's notice of any schedule changes or days off. After receiving an assignment, claimant had to drive to the pick-up location, notify CTG when he arrived at the location and wait for the passenger for up to 30 minutes. If claimant did not wait the required time, he would not be paid for the assignment.
If claimant was seeking work that was not preassigned, he could log on to the mobile application to indicate that he was available. He would then select a zone and would be placed in the driver queue for that zone. Customers called CTG's dispatch center to request a ride, and, after the customer's request was entered into the dispatch system, it was offered to the first driver in the queue. If the driver did not accept an assignment within 45 seconds, he or she would have to rebook or book to another zone, and the assignment would be passed to the next driver in the queue. If the driver canceled an accepted assignment, CTG blocked access to the mobile application for three hours. To be paid, the driver had to submit vouchers and credit card receipts to CTG. Client billing and collection were then handled by CTG. Claimant's earnings were reported on a 1099 form. CTG also generally dealt with customer complaints and disciplined the drivers. Notwithstanding evidence in the record that might support a contrary conclusion, the foregoing constitutes substantial evidence to support the Board's determination that CTG retained sufficient overall control over the work performed by claimant and other similarly situated drivers to establish an employment relationship (see Matter of Jung Yen Tsai [XYZ Two Way Radio Serv., Inc.-Commissioner of Labor], 166 AD3d 1252, 1255 [2018]; Matter of June-Il Kim [Suk Inc.-Commissioner of Labor], 127 AD3d 1487, 1488 [2015], lv denied 26 NY3d 901 [2015]; Matter of Khan [Mirage Limousine Serv., Inc.-Commissioner of Labor], 66 AD3d 1098, 1100 [2009], lv denied 13 NY3d 717 [2010]; Matter of Odyssey Transp., LLC [Commissioner of Labor], 62 AD3d 1175, 1176 [2009]; compare Matter of Escoffery [Park West Exec. Servs. Inc.-Commissioner of Labor], ___ AD3d ___ [decided herewith]). To the extent that CTG's remaining contentions are not addressed, they have been considered and found to be without merit.
Garry, P.J., Egan Jr., Clark and Colangelo, JJ., concur.
ORDERED that the decisions are affirmed, without costs.